**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| MATTHEW HALL, | ) |
| on behalf of Plaintiff and the class | ) |
| members described herein, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) |
| | ) |
| MINTO DEVELOPMENT | ) |
| CORPORATION; | ) |
| BENHTI ECONOMIC | ) |
| DEVELOPMENT CORPORATION; | ) |
| DOUGLAS WILLIAM ISAACSON; | ) |
| MINTO FINANCIAL d/b/a Minto Money; | ) |
| and JOHN DOES 1-20, | ) |
| | ) |
| Defendants. | ) |

## COMPLAINT – CLASS ACTION

## INTRODUCTION

1.    Plaintiff, Matthew Hall, brings this action to secure redress against the making

of usurious loans to Plaintiff (Exhibit A) and other Illinois residents by Defendants Minto

Development Corporation ("MDC"), Benhti Economic Development Corporation ("BEDCO"),

Douglas William Isaacson ("Isaacson"), Minto Financial d/b/a Minto Money ("Minto Money"), and

John Does 1-20.

2.    Plaintiff seeks a declaratory judgment that the loans are void and an injunction

against their collection (Count I), damages pursuant to the Illinois Interest Act, 815 ILCS 205/6

(Count II), damages and injunctive and declaratory relief pursuant to the Illinois Predatory Loan

Prevention Act, 815 ILCS 123/15-1-1 *et seq.*, and the Illinois Consumer Fraud Act, 815 ILCS 505/1

*et seq.* (Count III – the Predatory Loan Prevention Act provides that violations are a violation of the

Illinois Consumer Fraud Act), and treble damages under RICO (Count IV).

## JURISDICTION AND VENUE

3.      The Court has subject matter jurisdiction under 28 U.S.C. § 1331, 18 U.S.C. § 1964, 28 U.S.C. § 1337, and 28 U.S.C. § 1367. Jurisdiction may also exist under 28 U.S.C. § 1332(d).

4.      This Court has personal jurisdiction over Defendants because they:

         a.      Knowingly participated in the making and collection of unlawful loans to Illinois residents. In similar actions against purported "tribal" lenders, courts have held that personal jurisdiction over the persons involved in making the loans exists in the state where the borrower obtained a loan via the Internet, and in which loan funds were disbursed via ACH transfer. *Gingras v. Rosette*, 5:15cv101, 2016 U.S. Dist. LEXIS 66833, 2016 WL 2932163, at *2-3, *9 (D. Vt. May 18, 2016)*, aff'd sub nom. Gingras v. Think Fin., Inc.*, 922 F.3d 112 (2d Cir. 2019) (finding that tribal lending entity's contacts with Vermont "would have been sufficient to subject [the tribal entity] to personal jurisdiction in Vermont" for purposes of claims for violations of state and federal law, including state usury laws and RICO, where tribal entity operated a website that advertised loans in Vermont, sent emails and loan applications to Vermont consumers and transferred loan principal to consumers' Vermont bank accounts); *Duggan v. Martorello*, 18cv12277, 2022 U.S. Dist. LEXIS 58075, at *33-34, 2022 WL 952183 (D. Mass. Mar. 30, 2022); *Dawkins v. Blue Dart Ventures*, 8:20cv2353, 2021 U.S. Dist. LEXIS 130297 (M.D. Fla. Apr. 1, 2021).

         b.      Selected which states to offer loans in, thereby targeting those states. *Illinois v. Hemi Group, LLC*, 622 F.3d 754, 760 (7th Cir. 2010).

5.      Venue is proper because acts to obtain and collect the loans impacted Plaintiff in Illinois.

6.      Article III is satisfied because actions for statutory damages and invalidation of loans for usury were entertained by the courts of England and the United States in 1787. English Usury Act of 1713, 12 Anne Session 2 c. 17. All thirteen original American states replaced the English usury statutes with their own usury laws between 1641 and 1791. Christopher L. Peterson, *Usury Law, Payday Loans, and Statutory Sleight of Hand: Salience Distortion in American Credit Pricing Limits*, 92

Minnesota Law Review 1110, 1116-18 (April 2008), summarizing statutes allowing 5% to 8% interest.

## PARTIES

### Plaintiff

7.      Plaintiff Matthew Hall is a resident of Wheeling, Illinois.

### Defendants

### BEDCO

8.      Defendant BEDCO is an economic development corporation purportedly organized under the laws of the Native Village of Minto, and uses the address of 205 Lakeview Dr., Suite 7, Minto, AK 99758.

### MDC

9.      Defendant MDC is an Alaska corporation with a registered mailing address of 615 Bidwill Ave., Suite 303, Fairbanks, AK 99701. MDC's Alaska registered agent is Roxanne Frank, 938 Dennis Rd., North Pole, AK 99705.

10.     MDC claims to be the owner of online payday lending website Minto Money, which operates from www.mintomoney.com.

11.     The Minto Money website is used to make loans to consumers, including consumers in Illinois, at annual percentage rates in excess of 200%.

### Isaacson

12.     Defendant Douglas William Isaacson ("Isaacson") is the Chief Executive Officer of MDC and maintains an office at 615 Bidwill Ave., Suite 303, Fairbanks, AK 99701. He may be found at 1003 Shirley Turnaround, North Pole, AK 99705.

13.     Isaacson was born in 1957 in Seattle, Washington, and is not a member of the Minto Tribe.

14.     Isaacson currently lives in North Pole, Alaska, about twelve miles south of Fairbanks. Isaacson formerly served as mayor of North Pole.

15.     Isaacson is a past president of Credit Services, Inc., which was an affiliate of Trans Union LLC ("Trans Union").

16.     According to Isaacson's online resume on LinkedIn, his job as CEO entails overseeing engagement in "innovative growth sectors" which include "lending." (Exhibit B)

### Minto Financial

17.     Defendants BEDCO, MDC and Isaacson claim that "Minto Financial d/b/a Minto Money" is "a wholly owned subsidiary of Benhti Economic Development Corporation ('BEDCO')" and a legal entity existing under the laws of the Native Village of Minto. Plaintiff therefore names it as a Defendant.

### John Does 1-20

18.     Defendants John Does 1-20 are other natural and artificial persons involved in the lending activities described herein.

### OPERATION OF MINTO MONEY

19.     The primary beneficiary of the loans made through the Minto Money website is Isaacson.

20.     Isaacson, via one or more entities controlled by him, acts as an agent or "authorized service provider" for Minto Money and obtains credit reports regarding consumers, purportedly for the exclusive end-use by Minto Money. Isaacson then contracts with outside, non-tribal members who perform underwriting analytics, customer service, collection duties, and all other related business functions.

21.     BEDCO, the purported parent company of MDC, is also controlled by Isaacson. Isaacson claims on his LinkedIn profile to be the CEO of MDC.

22.     Domain Name Registration records show that BEDCO's only website, www.bedco.us, is registered to Isaacson. (Exhibit C)

23.     When aggrieved consumers complain about Minto Money to organizations such as the Better Business Bureau ("BBB"), Isaacson responds personally to the complaints, identifying

himself as the "General Manager" of Minto Financial. (Exhibit D)

24. The Minto Tribe receives a 2% "fee" or "commission" on loan revenues.

25. The website www.mintomoney.com is currently held via a proxy (Exhibit E).

26. The servers used to host www.mintomoney.com are nowhere near Minto, Alaska (Exhibit F).

## HOW MINTO MONEY UNDERWRITING IS PERFORMED

27. Defendants obtain data on consumers from credit bureau reports ("CBRs") provided by consumer reporting agencies ("CRAs").

28. Once obtained, data in the CBRs is analyzed by software produced by outside, non-tribal vendors. The vendors' sophisticated algorithms crunch the CRAs data and assign a proprietary risk score to the applicant.

29. Isaacson and his non-tribal investors unilaterally determine the minimum qualifying score for a loan approval, the interest rate, repayment terms, and all other meaningful aspects of the loan.

30. The Minto Tribe has no say in these matters.

31. If a consumer is approved and elects to take out a loan, then completed loan documents and details are transmitted to a Minto Tribe representative who may be physically located in Minto. The representative then electronically "reviews" the documents and provides "final approval" to the loan while, supposedly, on the Minto Tribe's soil.

32. After the pro forma review by the Minto Tribe, the loan is funded with money under the express and direct control of Isaacson and his non-tribal investors. The Minto Tribe itself has no access to the bank accounts containing the working capital used to fund Minto Money loans. Isaacson then pays roughly 2% of the loan revenues to MDC, which, conveniently, he also controls. While MDC then uses these funds for tribal projects and provides assistance to tribal members, 98% of revenues are kept by Isaacson and his investors.

33. However, because of the rubber-stamp approval occurring in Minto, Isaacson,

BEDCO, MDC and the Minto Tribe claim the Minto Money loans are made on the Minto Tribe reservation and subject exclusively to Minto tribal law.

34.     The purported address of Minto Money, is 205 Lakeview Dr., Ste 7, Minto, AK 99758.  It also uses PO Box 58112, Minto, AK 99758.

35.     The Lakeview Drive address is a building on tribal lands, albeit a building with no individual suites or suite numbers.

36.     The address is a building used for school and senior lunch programs, community meetings, and village council operations. The idea that any company relying on e-commerce to facilitate large numbers of transactions is operating at 205 Lakeview Drive in Minto is dubious, at best, since the area lacks any high-speed internet service providers. DSL service is available, albeit at speeds of only 2 megabits per second.

37.     Isaacson, BEDCO, and MDC, doing business as Minto Money, frequently lend money to consumers in Illinois, transfer money to the accounts of Illinois consumers via banks located in Illinois, and then electronically debit those same Illinois accounts.

38.     At all times relevant, Isaacson, BEDCO, and MDC, doing business as Minto Money, operated an interactive website that was frequently accessed by consumers in Illinois relating to their high interest loans.

39.     The website stated that loans would not be made to persons in certain states. Illinois was not one of those states.

## FACTS RELATING TO PLAINTIFF

40.     On October 31, 2022, Plaintiff obtained a $1,200 loan from "Minto Money" at an annual percentage rate of 458.82%. (Exhibit A)

41.     Plaintiff made at least one payment on the loan, including interest.

42.     Typical "Minto Money" loans are made at an annual percentage rate exceeding 700%. (Exhibits G-H)

43.     The loan was made via the Internet to Plaintiff while Plaintiff was located in

Illinois, where Plaintiff resided.

44.     The loan was obtained for personal purposes and not for business purposes.

45.     None of the Defendants has ever had a lending license from the Illinois Department of Financial and Professional Regulation.

46.     None of the Defendants has ever had a state or federal banking or credit union charter.

47.     Without a lending license or bank or credit union charter, Defendants were not entitled to make loans to Illinois residents at more than 9% interest.

48.     "Minto Money" nevertheless advertises and makes loans to Illinois residents at rates greatly exceeding 9%.

49.     "Minto Money" sought out Illinois residents for such loans.

50.     All loans made by "Minto Money" were made at an annual percentage rate exceeding the 9% which a non-bank lender which does not have a license from the Illinois Department of Financial and Professional Regulation may charge for a loan made to an Illinois resident.

51.     Defendants nevertheless contend and represent on their website that the "Minto Money" loans are valid and enforceable loans ("Minto Money" FAQs, Exhibit I).

52.     Defendants also represent on their website (Exhibit I) that "Minto Money" is a "trusted loan lender, abiding by Federal Laws."

53.     Plaintiff disputes that the loans are valid and enforceable.

54.     Minto Money makes loans to consumers at interest rates that vastly exceed the maximum legal rate in Illinois.

55.     The Native Village of Minto (the "Minto Tribe") is a small, isolated, financially strapped American Indian tribe located about 75 miles northwest of Fairbanks, Alaska. It has approximately 223 enrolled members.

56.     Minto Financial and BEDCO, in turn, operate under a "tribal lending license" signed

by Shane Thin Elk ("Thin Elk"), the "commissioner" of the Minto Financial Services Licensing & Regulatory Commission. (Exhibit K)

57.     On information and belief, the "commission" has issued only one license in its existence: the one granted to operate Minto Money.

58.     The Minto Financial Services Licensing & Regulatory Commission was created immediately before issuing this single license.

59.     The "commission" places no restrictions on interest rates charged to consumers, unlike Alaska state law which limits payday loans to $500 and caps fees at $75 for such a loan.

60.     Thin Elk is an attorney who previously lived in Omaha, Nebraska, and formerly practiced law with (a) Fredericks Peebles & Morgan LLP, a law firm with a significant practice devoted to, per its website, "PROTECTING Tribal Sovereignty," and (b) Lochen Law Offices, PLLC, when he conducted seminars on "partnering with non-Tribal entities for commercial enterprises." (Exhibit L) He is now the owner of Thin Elk Law in Green Bay, Wisconsin, where he lives.

61.     On information and belief, Thin Elk is not a member of the Minto Tribe; rather, he is an enrolled member of a different Native American tribe located thousands of miles from Alaska.

62.     Minto Money is not beneficially owned or operated by the Minto Tribe, but rather, it operates primarily for the benefit of non-tribal members like Isaacson.

63.     The main function of the Minto Tribe is to appear, on paper at least, to control the lending operation so that Isaacson and his investors may use the specter of sovereign immunity as a way to ward off the consumers they victimize, as well as state and federal regulatory authorities.

## ILLINOIS PROHIBITIONS ON PREDATORY LOANS

64.     Effective March 23, 2021, the Illinois Predatory Loan Prevention Act made it unlawful for anyone other than a bank to make loans to Illinois residents at annual percentage rates

-8-

in excess of 36%. 815 ILCS 123/15-1-1 *et seq.* "Any loan made in violation of this Act is null and void and no person or entity shall have any right to collect, attempt to collect, receive, or retain any principal, fee, interest, or charges related to the loan." 815 ILCS 123/15-5-10.

65.     Under 815 ILCS 123/15-10-5(b), "Any violation of this Act, including the commission of an act prohibited under Article 5, constitutes a violation of the Consumer Fraud and Deceptive Business Practices Act."

66.     Both before and after March 23, 2021, it was unlawful for anyone who did not have a bank or credit union charter or a consumer lending license issued by the Illinois Department of Financial and Professional Regulation to make loans at more than 9% interest. 815 ILCS 122/1-15, 4-5; 205 ILCS 670/1.

67.     Any loans to Illinois residents at more than 9% that are made by unlicensed persons are void and unenforceable. 205 ILCS 670/20(d) ("Notwithstanding any other provision of this Section, if any person who does not have a license issued under this [Consumer Instalment Loan] Act makes a loan pursuant to this Act to an Illinois consumer, then the loan shall be null and void and the person who made the loan shall have no right to collect, receive, or retain any principal, interest, or charges related to the loan."); 815 ILCS 122/4-10(h) ("(h) Notwithstanding any other provision of this Section, if a lender who does not have a license issued under this [Payday Loan Reform] Act makes a loan pursuant to this Act to an Illinois consumer, then the loan shall be null and void and the lender who made the loan shall have no right to collect, receive, or retain any principal, interest, or charges related to the loan.").

68.     Any loans to Illinois residents at more than 9% that are made by unlicensed lenders violate the Interest Act, 815 ILCS 205/4, and are subject to statutory damages under 815 ILCS 205/6.

69.     Illinois has a criminal usury statute which defines the making of a loan by unlicensed persons at more than 20% interest as a felony. 720 ILCS 5/17-59 (formerly 720 ILCS 5/39-1 *et seq*). It applies to a person who "while either within or outside the State, by his own conduct or that of

another for which he is legally accountable," engages in conduct that amounts to an offense if "the offense is committed either wholly or partly within the State". 720 ILCS 5/1-5.

70.     Contracts made in violation of licensing requirements intended to protect the public, or in violation of criminal laws imposing substantial penalties, are void. *Chatham Foot Specialists, P.C. v. Health Care Serv. Corp.*, 216 Ill. 2d 366, 380, 837 N.E.2d 48 (2005). Neither choice of law clauses or other contractual devices can be used to avoid invalidation of loans made at criminally usurious rates. *Madden v. Midland Funding, LLC,* 237 F. Supp. 3d 130, 150 (S.D.N.Y. 2017) ("That New York chose to criminalize such conduct is further evidence that its usury prohibition is a fundamental public policy."); *MacDonald v. CashCall, Inc.,* 16cv2781, 2017 U.S. Dist. LEXIS 64761, 2017 WL 1536427, *7 (D.N.J., April 28, 2017), aff'd, 883 F.3d 220 (3d Cir. 2018).

71.     The Illinois Department of Financial and Professional Regulation has repeatedly brought cases against unlicensed out of state tribal and other lenders that make loans via the Internet or similar means to Illinois residents in Illinois. *E.g., In the Matter of Red Leaf Ventures, LLC,* No. 12 CC 569 (https://www.idfpr.com/dfi/ccd/Discipline/RedLeafVenturesCDOrder12CC569.pdf), *In the Matter of Money Mutual, LLC*, No. 12 CC 408 (https://www.idfpr.com/dfi/ccd/Discipline/ MoneyMutualCDOrder12CC408.pdf); *In the Matter of Hammock Credit Services*, No. 12 CC 581 (https://www.idfpr.com/dfi/ccd/Discipline/HammockCreditCDOrder12CC581.pdf); *In the Matter of Makes Cents, Inc., d/b/a Maxlend*, No. 17 CC 133 (https://www.idfpr.com/dfi/ CCD/Discipline/17CC133%20-%20Make%20Cents%20dba%20Maxlend%20Cease%20and%20De sist%20Order%20Bob%208%2016%202017.pdf)

## **RENT-A-TRIBE SCHEMES**

72.     In an attempt to evade prosecution under usury laws of states like Illinois, non-tribal owners of online payday lending businesses frequently engage in a business model commonly referred to as a "rent-a-tribe" scheme.

73.     Here, and in such schemes, non-tribal payday lenders create an elaborate charade claiming their non-tribal businesses are owned and operated by Native American tribes.

-10-

74.     The illegal payday loans are then made in the name of a Native American tribal business entity which purport to be shielded from state and federal laws prohibiting usury due to tribal sovereign immunity. However, the tribal lending entity is simply a facade for an illegal lending scheme; all substantive aspects of the payday lending operation – funding, marketing, loan origination, underwriting, loan servicing, electronic funds transfers, and collections – are performed by individuals and entities that are unaffiliated with the tribe.

75.     In exchange for use of the tribe's name, the beneficial owner of the payday lending scheme pays the cooperating tribe a fraction of the revenues generated. While the percentage varies from scheme-to-scheme, the number is almost always in the single digits.

76.     However, an entity must function as a legitimate "arm of the tribe" in order to fall under that tribe's sovereign immunity. *See Breakthrough Mgmt. Grp., Inc. v. Chukchansi Gold Casino & Resort*, 629 F.3d 1173, 1183 (10th Cir. 2010).

77.     To determine if a particular entity is entitled to sovereign immunity, the majority of courts have adopted the framework laid out in *Breakthrough*, which analyzed "(1) [the entities'] method of creation; (2) their purpose; (3) their structure, ownership, and management, including the amount of control the tribe has over the entities; (4) whether the tribe intended for the entities to have tribal sovereign immunity; (5) the financial relationship between the tribe and the entities; and (6) whether the purposes of tribal sovereign immunity are served by granting immunity to the entities." *Breakthrough* at 1183, 1187-88.

78.     These so-called "tribal lenders" usually do not survive scrutiny when examined closely, since virtually all business functions occur far from tribal land, by nontribal members, and overwhelmingly benefit non-tribal members to such a degree that tribal involvement is effectively nil.

79.     Where non-tribal individuals and entities control and manage the substantive lending functions, provide the lending capital necessary to support the operation, and bear the economic risk associated with the operation, they are not in fact "operated" by Native American tribes and,

-11-

therefore, are not shielded by sovereign immunity.

80.     Further, sovereign immunity, even if legitimately invoked, still does not turn an otherwise illegal loan into a legal one. *See, e.g., United States v. Neff,* 787 F. App'x 81 (3d Cir. 2019) (upholding criminal convictions of two individuals engaged in an online payday lending rent-a-tribe scheme; sovereign immunity does not transform illegal loans into legal ones, and "reasonable people would know that collecting unlawful debt is unlawful").

81.     Attempting to circumvent state interest rate caps by fraudulently hiding behind tribal sovereign immunity has been found to constitute criminal conduct. On October 13, 2017, a jury in the U.S. District Court for the Southern District of New York convicted Scott Tucker and Timothy Muir on 14 felony counts for their operation of a network of tribal lending companies. *See United States v. Tucker, et al.,* No. 1:16-cr-00091-PKC (S.D.N.Y.). The conviction was affirmed in *United States v. Grote,* 961 F.3d 105 (2d Cir. 2020).

## COUNT I - DECLARATORY AND INJUNCTIVE
## RELIEF AGAINST ILLEGAL CONDUCT

82.     Plaintiff incorporates paragraphs 1-81.

83.     This claim is against all Defendants.

84.     There is a controversy between Plaintiff and the class, on the one hand, and Defendants, on the other, as to whether Plaintiff and the class members must repay the loans made to them.

85.     Declaratory relief will resolve such controversy.

86.     An injunction is necessary to prevent Defendants from taking any action to collect the void debts.

## CLASS ALLEGATIONS

87.     Plaintiff brings this claim on behalf of a class, pursuant to Fed. R. Civ. P. 23(a) and (b)(2).

88.     The class consists of (a) all individuals with Illinois addresses (b) to whom a loan

was made in the name of Minto Money at more than 9% interest (c) which loan has not been paid in full.

89.     Plaintiff may alter the class definition to conform to developments in the case and discovery.

90.     The class is so numerous that joinder of all members is not practicable. On information and belief, based on the making of loans over the Internet using form documents, there are at least forty class members.

91.     There are questions of law and fact common to the class members, which common questions predominate over any questions relating to individual class members. The predominant common questions are whether Defendants engage in a practice of making and attempting to collect illegal loans.

92.     Plaintiff will fairly and adequately represent the class members. Plaintiff has retained counsel experienced in class actions and consumer credit litigation.

93.     Plaintiff's claims are typical of the claims of the class members. All are based on the same factual and legal theories.

94.     Defendant has acted on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate.

95.     The class is entitled to a declaration that Defendants are not entitled to collect on the loans described, an injunction against any further collection efforts by Defendants, and restitution of all such amounts collected by Defendants.

WHEREFORE, the Court should enter judgment in favor of Plaintiff and the class and against Defendants for:

        i.      Injunctive relief;

        ii.     Declaratory relief;

        iii.    Restitution of all amounts collected on the loans from members of the class;

iv.      Costs of suit; and

v.      Such other and further relief as the Court deems proper.

## COUNT II – ILLINOIS INTEREST ACT

96.    Plaintiff incorporates paragraphs 1-81.

97.    This claim is against all Defendants.

98.    Defendants contracted for and collected loans at more than 9% interest from Plaintiff and the class members, in violation of 815 ILCS 205/4.

99.    Plaintiff and the class members are entitled to statutory damages under 815 ILCS 205/6.

## CLASS ALLEGATIONS

100.    Plaintiff brings this claim on behalf of a class, pursuant to Fed. R. Civ. P. 23(a) and (b)(3).

101.    The class consists of (a) all individuals with Illinois addresses (b) to whom a loan was made in the name of Minto Money at more than 9% interest (c) which loan is still outstanding or has been paid on or after a date two years prior to the filing of suit.

102.    Plaintiff may alter the class definition to conform to developments in the case and discovery.

103.    The class is so numerous that joinder of all members is not practicable. On information and belief, based on the making of loans over the Internet using form documents, there are at least forty class members.

104.    There are questions of law and fact common to the class members, which common questions predominate over any questions relating to individual class members. The predominant common questions are whether Defendants engage in a practice of making and attempting to collect illegal loans.

105.    Plaintiff will fairly and adequately represent the class members. Plaintiff has retained counsel experienced in class actions and consumer credit litigation.

-14-

106. Plaintiff's claims are typical of the claims of the class members. All are based on the same factual and legal theories.

107. A class action is superior for the fair and efficient adjudication of this matter, in that:

a. Individual actions are not economically feasible.

b. Members of the class are likely to be unaware of their rights.

WHEREFORE, the Court should enter judgment in favor of Plaintiff and the class and against Defendants for:

i. Damages as provided in 815 ILCS 205/6.

ii. Attorney's fees, litigation expenses and costs of suit; and

iii. Such other and further relief as the Court deems proper.

## COUNT III – PREDATORY LOAN PREVENTION ACT AND ILLINOIS CONSUMER FRAUD ACT

108. Plaintiff incorporates paragraphs 1-81.

109. This claim is against all Defendants.

110. Defendants contracted for and collected loans prohibited by the Illinois Predatory Loan Prevention Act.

111. Violation of the Predatory Loan Prevention Act is a violation of the Illinois Consumer Fraud Act, 815 ILCS 505/1 *et seq.*

## CLASS ALLEGATIONS

112. Plaintiff brings this claim on behalf of a class, pursuant to Fed. R. Civ. P. 23(a) and (b)(3).

113. The class consists of (a) all individuals with Illinois addresses (b) to whom a loan was made in the name of Minto Money at more than 36% interest (all of its loans qualify) (c) on or after March 23, 2021.

114. Plaintiff may alter the class definition to conform to developments in the case and discovery.

-15-

115. The class is so numerous that joinder of all members is not practicable. On information and belief, based on the making of loans over the Internet using form documents, there are at least forty class members.

116. There are questions of law and fact common to the class members, which common questions predominate over any questions relating to individual class members. The predominant common questions are whether Defendants engage in a practice of making and attempting to collect illegal loans.

117. Plaintiff will fairly and adequately represent the class members. Plaintiff has retained counsel experienced in class actions and consumer credit litigation.

118. Plaintiff's claim is typical of the claims of the class members. All are based on the same factual and legal theories.

119. A class action is superior for the fair and efficient adjudication of this matter, in that:

    a. Individual actions are not economically feasible.

    b. Members of the class are likely to be unaware of their rights;

WHEREFORE, the Court should enter judgment in favor of Plaintiff and the class and against Defendants for:

    i. Compensatory damages;

    ii. Punitive damages;

    iii. Attorney's fees, litigation expenses and costs of suit; and

    iv. Such other and further relief as the Court deems proper.

## COUNT IV – RICO

120. Plaintiff incorporates paragraphs 1-81.

121. This claim is against Isaacson, who is the RICO "person."

122. All loans made in the name of Minto Money to Illinois residents are (a) unenforceable under Illinois law in whole or in part as to principal or interest because of the laws relating to usury, and (b) were incurred in connection with the business of lending money at a rate

usurious under Illinois law, where (c) the usurious rate is at least twice the enforceable rate (9%).

123. The loans are therefore "unlawful debts" as defined in 18 U.S.C. § 1961(6).

124. Minto Money is an enterprise affecting interstate commerce, in that it is located outside of Illinois and makes loans to Illinois residents via the Internet.

125. Defendant Isaacson is associated with this enterprise.

126. Defendant Isaacson conducted or participated in the conduct of the affairs of Minto Money through a pattern of collection of unlawful debt, as set forth above, in violation of 18 U.S.C. § 1962(c).

127. Plaintiff was deprived of money as a result.

## CLASS ALLEGATIONS

128. Plaintiff brings this claim on behalf of a class.

129. The class consists of (a) all individuals with Illinois addresses (b) to whom a loan was made in the name of Minto Money at more than 9% interest (c) which loan was made on or after a date 4 years prior to the filing of suit.

130. Plaintiff may alter the class definition to conform to developments in the case and discovery.

131. The class is so numerous that joinder of all members is not practicable. On information and belief, based on the making of loans over the Internet using form documents, there are at least forty class members.

132. There are questions of law and fact common to the class members, which common questions predominate over any questions relating to individual class members. The predominant common questions are:

        a.     Whether the loans at issue are "unlawful debts" as defined in RICO.

        b.     Whether Minto Money is an "enterprise."

        c.     Whether Defendant Isaacson is associated with Minto Money.

        d.     Whether Defendant Isaacson conducted or participated in the affairs of

Minto Money through a pattern of making and collecting unlawful loans.

133. Plaintiff will fairly and adequately represent the class members. Plaintiff has retained counsel experienced in class actions and consumer credit litigation.

134. Plaintiff's claims are typical of the claims of the class members. All are based on the same factual and legal theories.

135. A class action is superior for the fair and efficient adjudication of this matter, in that:

a. Individual actions are not economically feasible.

b. Members of the class are likely to be unaware of their rights.

WHEREFORE, the Court should enter judgment in favor of Plaintiff and the class and against Defendants for:

i. Treble damages;

ii. Attorney's fees, litigation expenses and costs of suit; and

iii. Such other or further relief as the Court deems proper.

*/s/ Daniel A. Edelman*
Daniel A. Edelman

Daniel A. Edelman (ARDC 0712094)
Tara L. Goodwin (ARDC 6207473)
Matthew J. Goldstein (ARDC 6339033)
**EDELMAN, COMBS, LATTURNER & GOODWIN, LLC**
20 South Clark Street, Suite 1500
Chicago, IL 60603-1824
(312) 739-4200
(312) 419-0379 (FAX)
Email address for service:  courtecl@edcombs.com

-18-

## <u>JURY DEMAND</u>

Plaintiff demands trial by jury.

*/s/ Daniel A. Edelman*
Daniel A. Edelman

## <u>NOTICE OF LIEN AND ASSIGNMENT</u>

Please be advised that we claim a lien upon any recovery herein for 1/3 or such amount as a court awards. All rights relating to attorney's fees have been assigned to counsel.

*/s/ Daniel A. Edelman*
Daniel A. Edelman

**LIST OF EXHIBITS**

A        Matthew Hall's loan agreement

B        Isaacson's online resume on LinkedIn

C        Domain Name Registration records for www.bedco.us

D        Responses to Better Business Bureau complaints about Minto Money

E        Domain registration for www.mintomoney.com

F        Server location for www.mintomoney.com

G        Example of Minto Money Loan at over 700%

H        Example of Minto Money Loan at over 700%

I        Material from Minto Money web site

J        Material from Minto Money website

K        Minto Money tribal lending license

L        Shane Thin Elk biographical information